**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CIVIL ACTION NO. 25-115-DLB-CJS**

**JOHN W. SANDERS**                                                                        **PLAINTIFF**

**VS.**                            **MEMORANDUM OPINION AND ORDER**

**MCLANE COMPANY, INC. d/b/a**
**MCLANE CINCINNATI, et al.**                                                **DEFENDANTS**

* * * * * * * * * * * * * * * * * *

This matter is before the Court upon the Motion to Dismiss (Doc. # 5) filed by Defendants McLane Company, Inc., doing business as McLane Cincinnati ("McLane"), Ken Shapiro ("Shapiro"), and Joe Hotel ("Hotel") (collectively, "Defendants").  Plaintiff John Sanders ('Sanders") responded (Doc. # 9), Defendants replied (Doc. # 10).  The motion is now ripe for the Court's review.  For the following reasons, Defendants' Motion to Dismiss (Doc. # 5) is **granted.**

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Given the present procedural context, the following factual summary is taken from Sanders's Complaint (Doc. # 1-2) and construed in his favor.  *See Crugher v. Prelesnik*, 761 F.3d 610, 614 (6th Cir. 2014) (internal citations omitted).

Sanders worked for McLane as a dock supervisor at its Hebron, Kentucky location. (Doc. # 1-2 ¶¶ 11; 46).  Prior to the events giving rise to this lawsuit, Sanders had worked at McLane for six years.  (*Id.* ¶ 12).  However, Sanders's tenure at McLane ended abruptly in July of 2024.  (*Id.* ¶ 44).  On July 12, 2024, Sanders was the sole dock supervisor on duty.  (*Id.* ¶ 17).  Sometime around 5:00 p.m. Sanders received a report that another

1

McLane employee, Luis, was feeling ill.  (*Id.* ¶ 16).  Sanders located Luis, who was lying on the floor, apparently ill or asleep.  (*Id.* ¶ 21).  Through a translator, Sanders instructed Luis to go home for the day.  (*Id.* ¶ 25).

Afterwards, Sanders returned to his desk, where he composed a closing email documenting these events.  (*Id.* ¶ 26).  As Sanders worked on this email, another McLane employee, Hector Molina, stated that he discovered several empty containers of an alcoholic beverage in Luis's trash bag.  (*Id.* ¶¶ 27-28).  Sanders took photos of these containers and included them in an additional email to members of McLane's management team informing them of this discovery.  (*Id.* ¶ 30).

The next week, on July 16, 2024, Sanders was summoned to a meeting with Mike Wiehoff, McLane's warehouse manager, and Defendant Hotel, McLane's Director of Human Resources for the Cincinnati area.  (*Id.* ¶¶ 3; 32).  During this meeting, Hotel mentioned the "reasonable suspicion steps" that, by McLane's policies, supervisors were required to follow when confronted with indicia of alcohol intoxication.  (*Id.* ¶¶ 34-35).  Sanders, however, had not received any training on the requisite reasonable suspicion steps for 2024 and, in prior years, all supervisors at McLane completed such training with the aid of "cheat sheets."  (*Id.* ¶ 35).  Indeed, Sanders and the other supervisors at McLane have traditionally struggled with the reasonable suspicion training and have been unable to successfully complete the training without a "paper printout of the answers." (*Id.* ¶ 45).  Sanders alleges that McLane's leadership team, including Defendants Hotel and Shapiro, were well aware of these practices.  (*Id.* ¶ 35).

The following day, July 17, 2024, Mike Wiehoff contacted Sanders with a couple of questions from Dan Bailey, a Director of Operations at McLane.  (*Id.* ¶ 40).  Again,

2

these questions concerned the reasonable suspicion guidelines and testing, as well as Sanders's conclusion that Luis was merely ill, rather than intoxicated, when Sanders sent him home on July 12, 2024.  (*Id.* ¶ 41).  Although the Complaint offers a somewhat elusive account of these questions and Sanders's responses, it alleges that Sanders texted Wiehoff "numerous examples of [Sanders] following practices, policies, and procedures of Defendant McLane."  (*Id.* ¶ 43).

On July 19, 2024, Defendants Hotel and Shapiro informed Sanders that he had been fired.  (*Id.* ¶ 44).  Sanders maintains that he was wrongly terminated "due to the nature of the turmoil and disarray at Defendant McLane's Hebron location and in a proverbial 'rush to judgment' and not following their unilateral rules for resolving grievances and/or workplace conflicts."  (*Id.* ¶ 46).  Further, Sanders alleges that this "outrageous behavior" caused him to suffer severe emotional distress, a loss of earning capacity, and physical illness which required hospitalization.  (*Id.* ¶¶ 46-47).

On July 15, 2025, Plaintiff filed a Complaint  in Boone County Circuit Court, bringing claims for wrongful discharge and intentional infliction of emotional distress against all Defendants and a claim for negligent supervision against Defendants Shapiro and Hotel.  (*Id.*).  Defendants removed the case to this Court on August 11, 2025.  (Doc. # 1).  After filing the Notice of Removal, Defendants filed the instant Motion to Dismiss (Doc. # 5).  Sanders filed a Response (Doc. # 9), and Defendants filed a Reply (Doc. # 10).

## II.    STANDARD OF REVIEW

Defendants move the Court to dismiss Sanders's Complaint (Doc. # 1-2) for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. # 5 at 1).  The

Federal Rules of Civil Procedure require that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted). This "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quotations omitted). Indeed, a complaint lacks facial plausibility where "it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

The plaintiff must put forward facts sufficient to allow the Court to reasonably infer "that the defendant is liable for the misconduct alleged." *Id.* When considering a Rule 12(b)(6) motion, a district court "must construe the complaint in a light most favorable to the plaintiff, accept all of the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Hooker v. Anderson*, 12 F. App'x 323, 325 (6th Cir. 2001) (quoting *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)).

III.    **ANALYSIS**

A.    **Sanders fails to state a claim for wrongful discharge.**

In Count I of his Complaint, Sanders brings a claim for "wrongful/unlawful termination/discharge." (Doc. # 1-2 ¶¶ 60-66). In Kentucky, "absent 'a specific contractual provision to the contrary,' employment is generally terminable at-will." *McDonald v. Kroger Co.*, No. 3:20-cv-120-CHB, 2020 WL 9351270, at *3 (W.D. Ky. Sep.

4

30, 2020) (quoting *Miracle v. Bell Cnty. Emergency Med. Servs.*, 237 S.W.3d 555, 558 (Ky. Ct. App. 2007)). An employer may discharge an at-will employee "'for good cause, for no cause, or for a cause that some might view as morally indefensible.'" *Asbury Univ. v. Powell*, 486 S.W.3d 246, 262 (Ky. 2016) (quoting *Wymer v. JH Properties, Inc.*, 50 S.W.3d 195, 198 (Ky. 2001)). However, Kentucky law recognizes a narrow public policy exception to the terminable-at-will doctrine—the tort of wrongful discharge. *See Greissman v. Rawlings and Associates, PLLC*, 571 S.W.3d 561, 566 (Ky. 2019). Wrongful discharge applies when "the firing of an employee undermined a 'most important public policy.'" *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 420 (Ky. 2010) (quoting *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 734 (Ky. 1983)).

"To establish a cause of action for wrongful discharge, an employee must show that the termination was contrary to public policy evinced by a constitutional or statutory provision, or that the discharge directly resulted from the employee's refusal to violate the law during the course of his employment." *Greissman*, 571 S.W.3d at 566. Thus, a discharge violates public policy in three circumstances. These include (1) where an "explicit legislative statement[] prohibit[s] the discharge," (2) where "the alleged reason for the discharge . . . was the employee's failure or refusal to violate a law in the course of employment," or (3) where "the reason for the discharge was the employee's exercise of a right conferred by well-established legislative enactment." *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 652 (Ky. 2019). Additionally, a plaintiff must allege that he was discharged in violation of a public policy that has an employment-related nexus. *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985).

5

Sanders's Complaint (Doc. # 1-2) does not clearly identify a specific public policy, let alone point the Court to a constitutional or statutory provision exhibiting such a policy. Sanders comes closest to establishing the requisite public policy with his allegation that "[w]rongful discharge includes firing an employee in unlawful retaliation for reporting illegal or dangerous conditions in the workplace . . . ." (*Id.* ¶ 61). Because McLane fired Sanders in retaliation for raising concerns about the effectiveness of the reasonable suspicion testing, Sanders argues that his termination violated "public policies promoting workplace safety." (Doc. # 9 at 2).

However, merely reporting illegal or dangerous workplace conditions to management as opposed to public authorities, "is not protected activity under the public policy exception." *Zumot v. Data Mgmt. Co.*, No. 2002-CA-002454-MR, 2004 WL 405888, at *1 (Ky. Ct. App. Mar. 5, 2004); *see also Alexander v. Eagle Mfg. Co., LLC*, No. 15-127-DLB-JGW, 2016 WL 5420573, at *5 (E.D. Ky. Sep. 27, 2016) (dismissing wrongful discharge claim where plaintiff failed to allege that he reported allegedly illegal activity to public authorities). Sanders does not allege that he brought his concerns to the attention of any public authorities—merely that he discussed McLane's reasonable suspicion testing policies during a meeting with Defendant Hotel (McLane's Director of Human Resources) and Mike Wiehoff (a warehouse manager at McLane). (Doc. # 1-2 ¶ 35). Sanders also alleges that he was subsequently asked a question regarding the reasonable suspicion guidelines by Dan Bailey, who was also part of McLane's management structure. (*Id.* at 41).[1] Because Sanders has failed to allege that he

---

[1]    Although Sanders alleges that Defendant Hall "brought up the reasonable suspicion steps" (*Id.* ¶ 35) and that Bailey asked a question which "surrounded the reasonable suspicion guidelines," (*Id.* ¶ 41), Sanders does not provide his responses to these inquiries in his Complaint.

"brought his alleged complaint to the attention of public authorities, and not just [McLane's] management", his wrongful discharge claim fails.  *See Chavez v. Dakkota Integrated Sys., LLC*, 832 F. Supp. 2d 786, 803-04 (W.D. Ky. 2011) (granting summary judgment to defendant where plaintiff offered no evidence that he complained of a workplace safety issue to anyone outside of defendant's management).[2]

Sanders further argues that "[w]rongful discharge also includes reporting or cooperating in investigation of matters related to discrimination or harassment . . . ." (Doc. # 1-2 ¶ 61).  In a somewhat opaque allegation, Sanders maintains that McLane wrongfully discharged him after he "reported the turmoil and disarray of having a 'revolving door' of employees, lack of training, and following the policies, procedures, and protocol of Defendant McLane."  (*Id.*).  In his Response, Sanders elaborates that "his wrongful discharge was as a result of his reporting or cooperating in investigation of matters related to discrimination or harassment which would be prohibited by the Kentucky Civil Rights Act, a clearly established statutory public policy."  (Doc. # 9 at 2).  Despite these contentions, Sanders's Complaint does not mention any specific facts about the nature of such discrimination or harassment.  These omissions doom his wrongful discharge claim.  *Grzyb*, 700 S.W.2d at 401-402.

---

[2]    Even if Sanders *had* brought his concerns regarding workplace safety at McLane to the attention of a public authority, his wrongful discharge claim would still fail because such claims are preempted by Kentucky's Occupational Safety and Health statute (KOSHA).  *See McDonald*, 2020 WL 9351270, at *4 ("[A] claim for wrongful discharge in violation of public policy under the KOSHA statute is preempted by the statute itself.") (citing *Benningfield v. Petit Environmental, Inc.*, 183 S.W.3d 567, 570 (Ky. App. 2005)).  Although KOSHA explicitly prohibits an employee's discharge for filing a complaint or instituting a proceeding related to workplace safety, it also provides an exclusive statutory remedy.  *Maiden v. N. Am. Stainless, L.P.*, 125 F. App'x 1,4 (6th Cir. 2004) ("KOSHA provides a statutory structure for employees to seek a remedy, thereby preempting any common-law wrongful discharge claims based on those statutes.").

Moreover, the statutory provision Sanders cites in his Response—the Kentucky Civil Rights Act ("KCRA")—would preempt his wrongful discharge claim. The KCRA "prohibits an employer from 'retaliat[ing] or discriminat[ing] in any manner against a person because he has opposed a practice declared unlawful by [the KCRA], or because he has made a charge, filed a complaint, testified, assisted, or participated in any investigation, proceeding or hearing under [the KCRA] . . . ." *Whitsell v. Park Cmty. Credit Union*, No. 3:25-cv-00010-GNS, 2025 WL 2714550, at *4 (W.D. Ky. Sep. 23, 2025) (quoting KRS 344.280(1)). Setting aside the issue of whether Sanders actually faced retaliation for opposing an unlawful practice, the KCRA provides the exclusive avenue for asserting a claim for such discriminatory acts. *Grzyb*, 700 S.W.2d at 401. Because, in Sanders's case, the "fundamental and well-defined public policy" he offers as a basis for his wrongful discharge claim comprises "the very same public policy embodied in" the KCRA, his common law claim is preempted. *Hill*, 327 S.W.3d at 421; *see also Grzyb*, 700 S.W.2d at 401 (holding that, in such cases, the KCRA "not only creates the public policy but preempts the field of its application").

Despite these deficiencies in his pleadings, Sanders argues that his Complaint (Doc. # 1-2) passes muster because it has "sufficiently advise[d] the Defendant of the nature and substance of the claims against [it]." (Doc. # 9 at 3). And, Sanders claims, under Kentucky law, that is enough. (*Id.* at 1-2 (citing Ky. R. Civ. P. 8.01(a)). However, Sanders misunderstands the applicable pleading standard. The Federal Rules of Civil Procedure apply to civil actions in federal courts, "regardless of whether jurisdiction is based on federal question or diversity of citizenship." *Hayes v. Equitable Energy Res. Co.*, 266 F.3d 560, 566 (6th Cir. 2001).

8

In a diversity case such as this (*see* Doc. # 1 ¶ 22), Sanders must meet the facial plausibility standard of Federal Rule of Civil Procedure 8(a)(2), rather than Kentucky's more lenient pleading standard.  *See Hagyard-Davidson-McGee Associates, PLLC v. Fed. Ins. Co.*, No. 5:20-cv-00171-JMH, 2021 WL 4130504, at *4 (E.D. Ky. Sep. 9, 2021) (observing that, in contrast to the Federal Rules, "a more lenient pleading standard is applicable under Kentucky law").  For the reasons discussed above, Sanders has failed to plead facts sufficient to allow the Court to reasonably infer that Defendants are liable for wrongful discharge.  *See Iqbal*, 556 U.S. at 678.

Because Sanders failed to allege facts showing that he was terminated in violation of a public policy demonstrated by a statutory or constitutional provision, he cannot avail himself of the narrow exception to Kentucky's terminable-at-will doctrine.  Thus, Count I of his Complaint (Doc. # 1-2) must be **dismissed**.

B.     **Sanders fails to state a claim for intentional infliction of emotional distress.**

Sanders alleges that he "incurred intentional infliction of emotional distress at the hands of the Defendants . . . as a result of their unilateral actions."  (Doc. # 1-2 ¶ 68).  Specifically, he claims that Defendants caused him severe emotional distress when they "ignore[d] numerous reports and reservations raised by [Sanders]" and terminated his employment.  (*Id.* ¶ 69).  Finally, Sanders alleges that Defendants' creation of "an intolerable work environment" resulted in Sanders's suffering severe emotional distress.  (*Id.* ¶ 70).

In Kentucky, a plaintiff must establish four elements to make out a claim for intentional infliction of emotional distress: "(1) the wrongdoer's conduct must be intentional or reckless; (2) the conduct must be outrageous and intolerable in that it

offends against the generally accepted standards of decency and morality; (3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress must be severe." *Meade v. AT&T Corp.*, 657 F. App'x 391, 398 (6th Cir. 2016) (citing *Humana of Ky., Inc. v. Seitz*, 796 S.W.2d 1, 2-3 (Ky. 1990) (quoting *Craft v. Rice*, 671 S.W.2d 247, 249 (Ky. 1984))). "Kentucky courts have recognized this tort in only the most egregious cases." *Dotson v. Wal-Mart Stores, Inc.*, No. 96-6690, 1998 WL 669940, at *1 (6th Cir. Sept. 17, 1998). A claim for intentional infliction of emotional distress will only lie where a defendant's conduct "is 'so outrageous in character, and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Wad v. Amazon.com Servs. Inc.*, 2:18-cv-97-DLB-CJS, 2020 WL 1066985, at *9 (E.D. Ky. Mar. 4, 2020) (quoting *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 789 (Ky. 2004), *overruled on other grounds by Toler v. Sud-Chemie, Inc.*, 458 S.W.3d 276 (Ky. 2014) (quotation omitted)).

Negative employment actions rarely rise to the level of outrageous and intolerable conduct necessary for a claim of intentional infliction of emotional distress. "Being demoted, criticized for work performance, passed over for promotion, and terminated pales in comparison to each of [the] instances where Kentucky courts have found recovery appropriate." *Bargo v. Goodwill Indus. Of Ky., Inc.*, 969 F. Supp. 2d 819, 827 (E.D. Ky. 2013). Moreover, "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppression, or other trivialities." *Dotson*, 1998 WL 669940, at *1 (quoting Restatement (Second) of Torts § 46 cmt. d (1965)).

Here, Sanders alleges that Defendants engaged in various actions that were so outrageous as to cause him severe emotional distress. (Doc. # 1-2 ¶ 47). First, Sanders vaguely claims that Defendants' "unilateral actions" caused him to suffer emotional distress so severe that he sought medical care. (*Id.* ¶ 68). However, as discussed above, mere termination from employment does not constitute the outrageous and intolerable conduct required for a claim of intentional infliction of emotional distress. *See Highlands Hosp. Corp. v. Preece*, 323 S.W.3d 357, 368 (Ky. App. 2010) ("Termination from employment, even if for discriminatory reasons, is insufficient to constitute outrageous conduct sufficient to support a claim for intentional infliction of emotional distress.") (citing *Benningfield*, 183 S.W.3d at 572; *see also Miracle v. Bell Cnty. Emer. Med. Serv.*, 237 S.W.3d 555, 560 (Ky. App. 2007) ("The mere termination of employment and the resulting embarrassment do not rise to the level of outrageous conduct and resulting severe emotional distress necessary to support a claim for IIED."). Accordingly, Sanders fails to state a claim for intentional infliction of emotional distress to the extent his claim is based on McLane's decision to fire him, which was neither outrageous nor intolerable. (Doc. # 1-2 ¶ 68).

Second, Sanders claims that Defendants engaged in intolerable and outrageous conduct when they ignored Sanders's reports and concerns regarding the environment at McLane. (*Id.* ¶¶ 47-48; 51; 69). This is a far cry from the kind of conduct needed to support a claim of intentional infliction of emotional distress. *See S.S. v. E. Ky. Univ.*, 532 F.3d 445, 459 (6th Cir. 2008) ("The cause of action for the intentional infliction of emotion[al] distress 'is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees.'") (quoting *Osborne v. Payne*, 31 S.W.3d

911, 914 (Ky. 2000)).    Defendants Shapiro, Hotel, and other members of McLane's management team did not transcend the "bounds of decency" when they ignored or disregarded Sanders's concerns.    *Craft*, 671 S.W.2d at 250; *see also Humana*, 796 S.W.2d at 3-4 (finding that a nurse's action in informing the mother of a recently stillborn infant "that [her] baby would be disposed of in the hospital" was "cold, callous, and lacking sensitivity, but [that] it certainly is not part of a pattern of conduct that 'is beyond all decency'").

Finally, Sanders claims that Defendants created an "intolerable work environment" that caused him severe emotional distress.   (Doc. # 1-2 ¶ 47).   Sanders offers examples of this allegedly intolerable environment, including McLane's Hebron location being "unsafe in general," the "revolving door of employees," at McLane, and the "disarray of workplace policies and procedures" which led to unspecified "harassment and discrimination" directed toward Sanders.   (*Id.*).   Sanders further alleges that, because of the high rate of employee turnover at McLane, he was forced to work alone at times, which caused him physical and mental fatigue, extreme emotional distress, and high blood pressure.   (*Id.*).   Again, these allegations do not constitute outrageous conduct sufficient to support a claim for intentional infliction of emotional distress.   To be sure, unpleasant or difficult working conditions may have caused Sanders discomfort and frustration.   However, merely unpleasant working conditions do not rise to the level of extremity necessary to sustain a claim for intentional infliction of emotional distress.   *See e.g., Bargo*, 969 F. Supp. 2d at 827 (finding no outrageous conduct where plaintiff was demoted, forced to work longer hours, deprived of job responsibilities, passed over for a promotion, and, ultimately, terminated); *Marshall v. The Rawlings Co., LLC*, 854 F.3d 368,

12

385 (6th Cir. 2017) ("Making a snide remark about taking leave, telling an employee she is not doing her job effectively during a demotion meeting, and creating an awkward situation at lunch are not actions so extreme that they are 'utterly intolerable in a civilized community.'") (quoting *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 407 (6th Cir. 1997)). Likewise, Sanders's vague allegations that the "turmoil and disarray" at McLane led to his suffering "harassment and discrimination" do not constitute outrageous and intolerable conduct by Defendants. (Doc. # 1-2 ¶ 47). Sanders does not provide any detail regarding the harassment and discrimination he allegedly suffered, let alone allege the kind of "prolonged, severe harassment that other courts have deemed extreme and outrageous." *Wad*, 2020 WL 1066985, at *9. Accordingly, he fails to state a claim for intentional infliction of emotional distress.

As with his wrongful discharge claim, Sanders argues that he has satisfied the applicable pleading standard under Kentucky law with respect to his claim for intentional infliction of emotional distress. (Doc. # 9 at 3 (arguing that, under Kentucky law, "the complaint just has to inform the Defendant of the nature of the case and harm done to Plaintiff")). However, as discussed above, the Federal Rules require more. *See Iqbal*, 556 U.S. at 678. Sanders must "state a claim for relief that is plausible on its face." *Twombly*, 550 U.S. at 570. He has failed to do so.

Because, viewing the Complaint in the light most favorable to Sanders, he has failed to allege outrageous and intolerable conduct by Defendants, Sanders's claim for intentional infliction of emotional distress is **dismissed**.

13

### C.    Sanders fails to state a claim for negligent supervision.

Finally, Defendants Shapiro and Hotel move to dismiss Count III of the Complaint, in which Sanders brings a claim for negligent supervision against them.  (Doc. # 5-1 at 9).

Kentucky courts have long recognized torts based on an employer's negligent hiring, training, supervision, and retention of its employees.  *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 336 n. 10 (Ky. 2014).  To succeed on a negligent supervision claim, a plaintiff must establish that (1) the employer knew or had reason to know of the risk that the employee created, (2) the employee injured the plaintiff, and (3) the supervision or retention of the employee proximately caused the injury.  *Grubbs v. Thermo Fisher Scientific*, No. 13-183-DLB-CJS, 2014 WL 1653761, at *2 (E.D. Ky. Apr. 23, 2014) (citing *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 844 (Ky. 2005)).  So, "an employer may be held liable for negligent supervision only if he or she knew or had reason to know of the risk that the employment created."  *Booker v. GTE.net LLC*, 350 F.3d 515, 517 (6th Cir. 2003).

Here, Sanders alleges that Defendants Shapiro and Hotel "can incur liability based upon their inadequate management or failure to supervise corporate affairs and subordinates and/or employees."  (Doc. # 1-2 ¶ 72).  Sanders asserts that "Defendants Shapiro and Hotel failed to adequately supervise subordinates that led to damages suffered by the Plaintiff in this matter."  (*Id.* ¶ 74).  In light of these actions, Sanders contends that "it is clear there was negligent hiring, supervision, or retention of subordinates that fell within the direct control of Defendants Shapiro and Hotel."  (*Id.* ¶ 75).

Defendants Shapiro and Hotel argue that Sanders cannot bring a negligent supervision claim against them because the tort is only available to third parties who sue an employer based on actions committed by one of its employees.  (*Id.* at 10 (quoting *Harris v. Burger King Corp.*, 993 F. Supp. 2d 677, 692-93 (W.D. Ky. 2014) (recognizing that "this tort has only been applied in cases in which a third party sues an employer whose employee committed a tort") (citations omitted))).  Because Sanders, a former McLane employee, seeks redress from members of McLane's management team, Shapiro and Hotel contend that Sanders cannot maintain a negligent supervision claim. (*Id.* at 11).  Additionally, Shapiro and Hotel argue that Sanders fails to allege that McLane itself, rather than Shapiro and Hotel individually, had reason to know that one of its employees posed a risk of harm.  (*Id.*).  Moreover, Shapiro and Hotel point to Sanders's failure to identify "any specific employee who created a risk to him," or "why that risk was foreseeable or how it ultimately caused him harm" as grounds for dismissal.  (*Id.*).

Kentucky courts have only recognized the tort of negligent retention or supervision in cases where a third party sued an "employer whose employee caused harm to someone they did not employ."  *Henn v. Pinnacle Publ'g., LLC*, No. 12-307-KSF, 2012 WL 6096670, at *3 (E.D. Ky. Dec. 7, 2012) (citing *Stalbosky v. Belew*, 205 F.3d 890 (6th Cir. 2000); *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. App. 1998)).  Indeed, the elements of the tort support this application.  To succeed on a negligent supervision claim, the plaintiff must show that an *employer*, rather than a mere *supervisor*, knew or had reason to know of the risk posed by one of its employees.  *See Grubbs*, 2014 WL 1653761, at *2.  Sanders does not even identify the specific "subordinates and/or employees" whose actions allegedly injured him.  (Doc. # 1-2 ¶ 72).  Likewise, Sanders

15

does not allege that Shapiro or Hotel employed the unnamed "subordinates" who inflicted the "damages suffered by [Sanders] in this matter." (*Id.* ¶ 74). As Defendants note in their Motion to Dismiss, Shapiro and Hotel were merely members of McLane's management team and not "employers." (Doc. # 5-1 at 11). Thus, Sanders's allegations fail to satisfy the first element of a negligent supervision claim.

Moreover, dismissal is appropriate because Sanders failed to address Defendants' arguments in his Response. (Doc. # 9). According to Local Rule 7.1, "[f]ailure to timely respond to a motion may be grounds for granting the motion." *See also Humphrey v. U.S. Att'y Gen.'s Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (holding that a plaintiff's failure to oppose arguments raised in a defendant's motion to dismiss is grounds for the district court to conclude that opposition to the motion is waived); *O'Hara v. Laurel Cnty. Corr. Ctr.*, No. 6:23-cv-026-CHB, 2023 WL 5729212, at *10 (E.D. Ky. Sep. 5, 2023) (finding that a plaintiff's failure to respond to a defendant's arguments concerning a negligent supervision claim constitutes a concession). Although Sanders's Response (Doc. # 9) addresses Defendants' arguments with respect to Counts I and II of the Complaint (Doc. # 1-2), it does not address Count III whatsoever.

Because Sanders failed to state a claim for negligent supervision against Defendants Shapiro or Hotel, and because Sanders failed to respond to Defendants' arguments concerning that claim, Count III is **dismissed**.

IV.   **CONCLUSION**

Accordingly, for the reasons stated herein, **IT IS ORDERED** that:

(1)   Defendants' Motion to Dismiss (Doc. # 5) is **granted**;

(2)   Plaintiff's Complaint (Doc. # 1-2) is **dismissed with prejudice**;

(3)   This matter is **stricken** from the Court's active docket; and

(4)     A **Judgment** in favor of **Defendants** will be entered contemporaneously

herewith.

This 26th day of November, 2025.



Signed By:

David L. Bunning

Chief United States District Judge

G:\Judge-DLB\DATA\ORDERS\Cov2025\25-115 MOO re MTD.docx